# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| ERIC HOOD, | No. 59672-5 |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| THE CITY OF DUPONT, | |
| Respondent. | |

CHE, J. — Eric Hood appeals the dismissal of his lawsuit against the City of DuPont based on allegations that the City violated the Public Records Act (PRA).

Hood submitted a public records request with the City, requesting all records related to an unrelated PRA lawsuit. In that lawsuit, an individual had made public records requests to the City, the City fulfilled those requests, and the individual sued, alleging that the City's search and fulfillment of the requests were inadequate under the PRA. The City settled the unrelated lawsuit.

After Hood's initial public records request, Hood clarified with the City that his request included the underlying records that were at issue in the unrelated PRA lawsuit. The City searched for responsive records and produced nearly 42,000 pages of records to Hood. Hood sued nearly a year later.

Hood moved for partial summary judgment and, concurrently to responding to Hood's motion, the City moved for judicial review and dismissal under RCW 42.56.550(3). After a hearing on both motions, the trial court denied Hood's motion, granted the City's motion, and

dismissed Hood's case. Hood moved for reconsideration which the trial court also denied. Thereafter, Hood brought two motions for relief from judgment under CR 60(b) which the trial court also denied.

Hood argues that the trial court erred in finding that (1) the City properly narrowed the scope of Hood's public records request, (2) the City adequately searched for responsive records, (3) the City did not keep records at Pierce County, (4) police records housed in another agency were not responsive to Hood's public records request, (5) the City made no misrepresentation, (6) any misrepresentations were immaterial, and (7) the City complied with the PRA.

We hold that Hood fails to show that the trial court erred in finding that the City adequately searched for responsive records related to Hood's specific request. Additionally, we hold that Hood fails to establish that the trial court abused its discretion in denying Hood's motions for relief from judgment. Moreover, due to insufficient briefing, we decline to consider any argument Hood may have related to the trial court's denial of his motion for partial summary judgment or motion for reconsideration.

Accordingly, we affirm.

BACKGROUND

I. UNDISPUTED FACTS

In September 2016, David Bungert filed two public records requests with the City. Bungert requested (1) "City phone records and city cell phone text messages for the month of September 2016" and (2) "Cell phone log screen shots (or photos for older phones) for all of the City of DuPont cell phones from September 19, 2016 through September 30, 2016." Clerk's Papers (CP) at 412. The City provided Bungert with responsive records. In November 2017, Bungert sued the City under the PRA, alleging that the City failed to adequately fulfill his

requests. Bungert later amended his complaint to include an allegation that the City failed to conduct a reasonable search for responsive records to another request, submitted sometime around October 2017, for:

> Any and all records showing communications between Dupont/Lakewood (judges, law enforcement, any officers, employees, or agent) and Nisqually Corrections about setting bail or the bail amount or lack of bail or bail revocation for [Bungert's son] on or about September 20, 2016.

CP at 1279. In July 2019, the City settled the public records lawsuit with Bungert.

On December 14, 2020, Hood e-mailed the City requesting "all records related to the lawsuit filed by David Bungert against [the City] for violating the [PRA]." CP at 83. Four days later, the City acknowledged to Hood that it received and reviewed Hood's request, completed a "cursory search of possible responsive records," and determined the City needed additional time to review and search records. CP at 85. The City told Hood that he could expect an installment by January 28, 2021.

On January 28, the City sent Hood the first installment of responsive records, stated that the City anticipated disclosing a next installment date on or before March 2, and asked Hood to clarify:

> whether the scope of your request for "all records related to the lawsuit filed by David Bungert" includes the underlying records that were at issue in Mr. Bungert's lawsuit?

CP at 88. Hood confirmed that his request included those underlying records.

Through multiple installments over the next year and a half, the City produced records to Hood. According to the City, the number of produced records totaled nearly 42,000 pages. On June 15, 2022, the City notified Hood that it had completed its search for records related to

Hood's request, released all responsive records, and, thus, considered Hood's request filled and closed.[1] The City provided Hood with a portal link to access the responsive records.

Hood asked the City to confirm how many documents the City provided. The City did not respond.[2]

## II. PROCEDURAL HISTORY

In June 2023, Hood sued the City. He alleged that the City violated the PRA by failing to (1) explain why records were withheld, (2) conduct an adequate search for responsive records, (3) produce responsive records and failing to document existence of such records in a withholding log, (4) enforce reasonable rules and regulations so as to provide full access to and protect public records, (5) provide "fullest assistance to Hood and the most timely possible action" for his request, (6) provide him with a reasonable estimate of time needed to respond to Hood's request, and (7) make all responsive records available to Hood. CP at 10.

In February 2024, Hood moved for partial summary judgment, arguing that the City inadequately searched for and withheld responsive records. As part of Hood's motion, he argued that the City did not search in places likely to contain responsive records, including City records stored by Pierce County, physical city council records later found in a cabinet in city hall, and physical or non-e-mail records of former and current employees who had been involved in Bungert's lawsuit. A week later, the City filed a "Motion for Judicial Review and Dismissal Pursuant to RCW 42.56.550(3)." CP at 154.

---

[1] The City's June 15 e-mail was from a "noreply" e-mail. CP at 89. To this e-mail, Hood replied, "I received a total of 380 separate documents. Is that the number you sent?" CP at 89. The record does not show any response by the City and, according to Hood, he never received a response.

[2] Additional facts relevant to the issues presented are included below in the analysis.

On March 18, 2024, in response to the City's motion, Hood argued, among other things, that the City failed to search City records maintained by Pierce County and South Sound 911 (SS9111).  Hood relied on, in part, his declaration that attached "a true and correct copy of Piece County's response to Hood's PRA request."  CP at 308.  The exhibit appears to be an e-mail from the County to Hood, responding to a January 2024 public records request to the County from Hood in which Hood requested:

> [A]ll City of DuPont records related to the lawsuit filed by David Bungert against DuPont for violating the [PRA] that the County maintained or maintains. That is, disclose the records that the County maintains or maintained for the City, not the records the County independently maintains or maintained. Please search especially the files maintained at piercecountytv.org.

CP at 374.

After a hearing[3] on both motions on March 29, 2024, the trial court denied Hood's motion for partial summary judgment.  The trial court granted the City's motion for judicial review and dismissed with prejudice the lawsuit.  In doing so, the trial court found that the City timely responded to Hood's request, adequately searched for responsive records, and timely disclosed them to Hood.

Hood moved for reconsideration under CR 59(a)(1), (7) and (9).  Hood argued that the parties' briefing established that "material facts are disputed, the City violated the PRA and failed to meet its burden of proof through non-conclusory affidavits."  CP at 1287.  He also

---

[3] Hood did not designate a report of proceedings for this hearing on appeal.  It is unclear whether the hearing included testimony or just review of declaration and documentary evidence.  *See* CP at 1276 (stating that the trial court "has considered all papers filed in support of and in opposition to the City's Motion . . . and argument presented by the parties" and also stating that the trial court's findings were "[b]ased on the testimony and other evidence presented and considered by this Court.").

argued that the City intentionally and improperly withheld material information relevant to its prior orders, resulting in a lack of substantial justice.

Before the trial court considered Hood's motion for reconsideration, Hood also moved for relief under CR 60(b). Hood argued that relief was warranted under CR 60(b)(3) based on "newly discovered evidence" that the City had kept and not produced responsive records located at the County. CP at 1345. As the "new evidence," Hood relied on an April 22, 2024, e-mail from the County in response to Hood's January 2024 public records request to the County. The County stated that it had identified 105 pages of responsive records and released 12 pages of those records to Hood. Hood also requested relief under CR 60(b)(4), arguing that the City never identified the County "as a location where it keeps the responsive records that the County disclosed to Hood." CP at 1347.

The trial court denied Hood's motion for reconsideration. The court also denied Hood's CR 60(b) motion, finding that Hood did not satisfy CR 60(b)(3)'s requirements for relief:

> There is no newly discovered evidence that would change the result if this case were reopened. There is nothing here that Mr. Hood could not have discovered before judgment by the exercise of due diligence. Mr. Hood's "newly discovered evidence" is not material and it is merely cumulative.

CP at 1414. The court also found that Hood did not satisfy CR 60(b)(4)'s requirements for relief:

> [Hood] has not established by clear and convincing evidence that he was prevented from fully and fairly presenting his case due to fraud, misrepresentation, or other misconduct by the City. Specifically, the Court finds that there had been no fraud, misrepresentation, or other misconduct by the City.
> The Court finds that the City was neither required nor allowed to search the files maintained by Pierce County for records responsive to Mr. Hood's public records request to the City. No records in Pierce County files are records belonging to the City of DuPont.

CP at 1415.

In December 2024, Hood again moved for relief under CR 60(b). Hood argued that new evidence showed that the City "concealed from Hood and [the] Court that it kept responsive records at [SS911] and falsely claimed that it had no duty to search there." CP at 1434. Hood argued that the City misrepresented facts and law to the trial court because the City argued "in bad faith" that it was not required or allowed to search SS911. CP at 1439. Hood argued that he newly discovered "undisputedly" responsive records from SS911 the City should have produced to Hood. CP at 1438. He stated that Hood discovered this "new evidence" after he, in June 2024, requested records from SS911 for "all City of Dupont records in the possession of your organization that mention or refer to the lawsuit filed by [Bungert] against the City." CP at 1437, 1476.

The trial court denied Hood's second CR 60(b) motion. The trial court found that Hood had not satisfied CR 60(b)(3)'s requirements for relief because (1) Hood established no newly discovered evidence that would change the result of the case, (2) Hood could have discovered the SS911 records if he had acted with due diligence, (3) the SS911 records were not material, and (4) Hood had raised the same argument previously in the case. The trial court also found that Hood had not met CR 60(b)(4)'s requirements because the City had not concealed the fact that it had not searched SS911's records in response to Hood's public records request.

Hood appeals.

## ANALYSIS

Hood brings seven assignments of error on appeal. Between the trial court's decision to grant the City's motion and dismiss Hood's lawsuit and the trial court's denials of Hood's CR 60(b) motions, Hood claims the trial court erred in finding that the City (1) properly narrowed

the scope of Hood's public records request, (2) adequately searched for responsive records, (3) the City did not keep records at the County, (4) the SS911 records were not responsive to Hood's public records request, (5) the City made no misrepresentation, (6) any misrepresentations were immaterial, and (7) the City complied with the PRA. Because Hood raised many of these arguments across multiple proceedings before the trial court and Hood does not clarify which arguments relate to which decision, we address each of Hood's arguments below as presented in his briefing and as they relate to the trial court dismissal of Hood's lawsuit through the City's motion and its denial of Hood's CR 60(b) motions. Any assignments of error not raised in argument and, thus, not addressed below are considered abandoned on appeal.[4]

## I. DISMISSAL OF HOOD'S LAWSUIT

A.    *Public Records Act*

The PRA is a "'strongly worded mandate for broad disclosure of public records.'" *Serv. Emps. Int'l Union Local 925 v. Univ. of Wash.*, 193 Wn.2d 860, 866, 447 P.3d 534 (2019) (*SEIU*) (internal quotation marks omitted) (quoting *Yakima County v. Yakima Herald-Republic*, 170 Wn.2d 775, 791, 246 P.3d 768 (2011)). It declares that "[t]he people of this state do not yield their sovereignty to the agencies that serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is

---

[4] Hood also sought review of the trial court's denial of Hood's motion for summary judgment and his motion for reconsideration. Am. Notice of Appeal at 13. However, outside of mentioning these motions and the trial court's denial of the motions in the factual section of Hood's briefing on appeal, Hood does not address these motions in argument nor does he provide any reasoned argument as to why these decisions were in error. Accordingly, we decline to consider whether any error occurred with these motions and consider any challenge to these decisions waived. *See Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998) ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration."); *Milligan v. Thompson*, 110 Wn. App. 628, 635, 42 P.3d 418 (2002) ("A party waives an assignment of error not adequately argued in its brief.").

not good for them to know." RCW 42.56.030. Accordingly, we must construe the PRA's

disclosure requirements liberally and its exemptions narrowly to promote this public policy and

to assure that the public interest will be fully protected. RCW 42.56.030; *Fisher Broad.-Seattle

TV LLC v. City of Seattle*, 180 Wn.2d 515, 521, 326 P.3d 688 (2014).

When a member of the public makes a public records request to an agency, the agency

must disclose any responsive records unless a specific exemption provided by the PRA or

another statute applies. *Nixon v. State*, 36 Wn. App. 2d 520, 525, 585 P.3d 770 (2026); RCW

42.56.070(1). The agency is not required, however, to create or disclose nonexistent records.

*Fisher*, 180 Wn.2d at 522. The agency has the burden of proving that its refusal to produce a

requested record was supported by law. *Nixon*, 36 Wn. App. 2d at 525; RCW 42.56.550(1).

We review de novo the agency's action in responding to a public records request. *Nixon*,

36 Wn. App. 2d at 525; *see also* RCW 42.56.550(3). If the record on appeal only consists of

declarations or other documentary evidence, we "stand[] in the same position as the trial court."[5]

*Nixon,* 36 Wn. App. 2d at 525; *SEIU*, 193 Wn.2d at 866.

B.      *The City Did Not Narrow the Scope of Hood's Request*

Hood argues that the City impermissibly narrowed the scope of his public records request

throughout the course of litigation. We disagree.

RCW 42.56.080(1)(a) requires a public records request to be for "identifiable records."

"A record is identifiable when the requester gives 'a reasonable description enabling the

government employee to locate the requested record.'" *Hood v. City of Vancouver*, 33 Wn. App.

---

[5] Although the trial court's order on the City's motion mentioned considering "testimony," there
is no indication in the record on appeal what was testified to if testimony occurred.

2d 799, 810, 564 P.3d 1009 (2025) (quoting *Beal v. City of Seattle*, 150 Wn. App. 865, 872, 209 P.3d 872 (2009)).

"The PRA does not 'require public agencies to be mind readers.'" *Id.* at 811 (quoting *Bonamy v. City of Seattle*, 92 Wn. App. 403, 409, 960 P.2d 447 (1998)). The agency must seek clarification if a request is unclear and must respond to parts of a request that are clear. *Id.* at 810-11; RCW 42.56.520(3)(a), (b). And an agency's interpretation of a public records request cannot be "narrower than its language." *West v. City of Tacoma*, 12 Wn. App. 2d 45, 81, 456 P.3d 894 (2020). We interpret the scope of a public records request based on the "actual wording" or "plain language . . . of the request" itself at the time when the request was made. *See id.*; *Hood*, 33 Wn. App. 2d at 812.

In full, Hood's public record request stated:

> May I have all records related to the lawsuit filed by David Bungert against Du Pont for violating the Public Records Act.

CP at 83. The City interpreted the subject of Hood's request to be the "prior lawsuit against the City." CP at 198. After providing Hood with a first installment of responsive records, the City sought clarification of whether Hood's "request for 'all records related to the lawsuit filed by David Bungert' include[d] the underlying records that were at issue in Mr. Bungert's lawsuit," and Hood responded that it did. CP at 88.

Preliminarily, Hood contends that the City improperly narrowed the scope of his request because some of the records produced by the City in response to Hood's request fell outside of the City's later-argued interpretation of Hood's request. But Hood's argument misconstrues our review of the scope of a public records request. We interpret the request based on its plain language, not after-the-fact interpretations or rationalizations of the requestor. *See West*, 12 Wn.

App. 2d at 81; *Hood*, 33 Wn. App. 2d at 812 (involving a public records request by Hood). The fact that an agency produces records exceeding a plain language reading of the request could indicate that the request could be unclear or ambiguous; however, an expanded production of records alone does not mean that the request did not clearly ask for something more limited. To be sure, there is no part of the PRA we know of that prohibits an agency from producing records beyond the scope of a public records request so long as no other law prohibits producing the records.[6] But the mere fact that an agency includes records beyond the plain language of the request does not expand the scope of the original request.

Turning to the plain language of Hood's request, the City contends that Hood requested all records relating to Bungert's PRA lawsuit and the records the City produced to Bungert in response to Bungert's public records requests at issue in the PRA lawsuit. Hood argues that this interpretation of his request is too narrow because the terms "related to" and "underlying" indicated a broader meaning than just litigation records and the public records the City produced to Bungert. Hood also argues that the proper interpretation of his request is a request, not just for the underlying PRA records the City provided Bungert, but also all records related to those underlying records. Reply Br. at 10 ("By detaching 'underlying' from 'related,' the City excused itself from searching entire categories of responsive records.").

The plain language of Hood's original request specified "all records related to" a distinct subject: Bungert's lawsuit against the City for violating the PRA. The plain language of Hood's request did not, as he argues, request records related to any incidents leading up to Bungert's public records requests such as Bungert's son's arrest or an unrelated assault. Nor did Hood's

---

[6] The City's public records request procedure even included as one of its "Guiding Methodologies" a general policy of "When in doubt, give it out." CP at 210.

request relate to any public records requests unrelated to those at issue in Bungert's lawsuit such as public records requests made by other individuals or other public records requests made by Bungert. Through the plain language of Hood's request, he limited the records sought to those related to the PRA litigation.

When the City asked for clarification of Hood's request, the City inquired whether Hood's original request "include[d]" specific records: "the underlying records that were at issue" in the lawsuit. CP at 88. Hood responded, "Yes" and clarified that "the scope of my request *does include* the underlying records." CP at 87. Hood contends his original request for "all records related to" carried over into his clarifying response that his request "include[d] the underlying records that were issue in Mr. Bungert's lawsuit." But this ignores the term "include[d]" which qualified and framed Hood's response to the City's clarification. By adopting and using the term "include[d]," Hood expressly framed "the underlying records" as being part of his original request, i.e., part of the "records related to" Bungert's PRA lawsuit. Contrary to Hood's argument, his clarification did not broaden the scope of his original request.

Reading Hood's clarification within the full text of Hood's request, the most reasonable meaning of the "underlying records" Hood sought were those the City had produced to Bungert as part of the PRA litigation. *See West*, 12 Wn. App. 2d at 79 ("We review the scope of the agency's search *as a whole*.") (emphasis added). The "underlying records" were specified to be those "at issue in Mr. Bergert's lawsuit." Bungert sued the City based on allegations that the City failed to fulfill or conduct a reasonable search for responsive records related to three public records requests. Accordingly, the "underlying records" at issue in Bungert's PRA lawsuit that logically would be different than the City's records related to the PRA litigation, were those records the City produced in response to those three public records requests.

Considering the plain language of Hood's request and later clarification, Hood clearly requested all records related to Burgert's PRA litigation, including the records the City produced to Bungert as part of his litigated public records requests.

C.      *The City's Request for Clarification Was Timely*

Hood argues that the City violated the PRA because it failed to ask Hood to clarify his request within five days of Hood's public records request. We disagree.

Under the PRA, an agency must respond to a public records request within five business days of receiving the request. RCW 42.56.520(1). The statute provides five ways the agency can properly respond. RCW 42.56.520(1) ("[A]n agency . . . must respond in *one of the ways provided in this subsection*."). The agency's options for responding are either:

> (a) Providing the record;
> (b) Providing an internet address and link on the agency's website to the specific records requested, except that if the requester notifies the agency that he or she cannot access the records through the internet, then the agency must provide copies of the record or allow the requester to view copies using an agency computer;
> (c) Acknowledging that the agency, the office of the secretary of the senate, or the office of the chief clerk of the house of representatives has received the request and providing a reasonable estimate of the time the agency, the office of the secretary of the senate, or the office of the chief clerk of the house of representatives will require to respond to the request;
> (d) Acknowledging that the agency, the office of the secretary of the senate, or the office of the chief clerk of the house of representatives has received the request and asking the requestor to provide clarification for a request that is unclear, and providing, to the greatest extent possible, a reasonable estimate of the time the agency, the office of the secretary of the senate, or the office of the chief clerk of the house of representatives will require to respond to the request if it is not clarified; or
> (e) Denying the public record request.

RCW 42.56.520(1).

Here, although the City's request for clarification occurred more than five business days from Hood's request, the City complied with RCW 42.56.520(1)'s requirements because it

responded according to RCW 42.56.520(1)(c). Hood e-mailed his public records request to the City on December 14, 2020. The City responded to Hood's e-mail four days later on December 18. In its response, the City acknowledged receiving Hood's December 14 request and told Hood he could expect an installment of responsive records by January 28, 2021. This response complied with the response requirements of RCW 42.56.520(1).[7]

D.      *The City's Search Was Adequate*

Hood argues that the City's search was inadequate for a host of reasons. *See* Br. of Appellant at 71. We disagree.

1.      *Adequate Search Legal Principles*

Upon receipt of a public records request, the agency must "adequately search" for responsive records. *West*, 12 Wn. App. 2d at 78-79. If the agency inadequately searches for responsive records, it violates the PRA. *Id.* However, a search does not need to be "'perfect, only adequate.'" *Neigh. All. of Spokane County v. Spokane County*, 172 Wn.2d 702, 720, 261 P.3d 119 (2011) (quoting *Meeropol v. Meese*, 252 U.S. App. D.C. 381, 395, 790 F.2d 942 (1986)). An agency does not violate the PRA per se by failing to locate and disclose a record that is eventually found. *Hood*, 33 Wn. App. 2d at 814. "The adequacy of the search itself is what matters." *Id.*

> In summary judgment proceedings concerning the adequacy of the agency's search:
>
> the agency bears the burden, beyond material doubt, of showing its search was adequate. . . . To do so, the agency may rely on reasonably detailed, nonconclusory affidavits submitted in good faith. These should include the search terms and the type of search performed, and they should establish that all places likely to contain responsive materials were searched.

---

[7] Hood makes no argument that the City's estimated time needed to respond was unreasonable so we do not evaluate whether it was. *Case Props. v. City of Bainbridge Island*, 199 Wn. App. 651, 663, 401 P.3d 327 (2017) (We do not make arguments for the parties.).

*Neigh. All.*, 172 Wn.2d at 720-21 (internal citations omitted); *see also Hood*, 33 Wn. App. 2d at 814. Washington courts give the agency affidavits "a presumption of good faith, and they outweigh 'speculative claims about the existence and discoverability of other documents.'" *Hood*, 33 Wn. App. 2d at 815 (quoting *Forbes v. City of Gold Bar*, 171 Wn. App. 857, 867, 288 P.3d 384 (2012)).

An adequate search is one that is "reasonably calculated to uncover all relevant documents." *Neigh. All.*, 172 Wn.2d at 720. Determining whether an agency adequately searched for responsive records is a fact-specific inquiry, and we judge the adequacy of a search by a standard of reasonableness. *Id.*; *Hood*, 33 Wn. App. 2d at 814. Washington courts consider "'the scope of the agency's search as a whole and whether that search was reasonable, not whether the requester has presented alternatives that [they] believe[ ] would have more accurately produced the records [they] requested.'" *Id.* at 815 (internal quotation marks omitted) (alterations in original) (quoting *West*, 12 Wn. App. 2d at 79).

An agency must "'make more than a perfunctory search and [must] follow obvious leads as they are uncovered.'" *Id.* at 814 (quoting *Neigh. All.*, 172 Wn.2d at 720). It cannot "'limit its search to only one record system if there are others that are likely to turn up the information requested.'" *Neigh. All.*, 172 Wn.2d at 720 (quoting *Oglesby v. U.S. Dept' of Army*, 287 U.S. App. D.C. 126, 920 F.2d 57, 68 (1990)). But an agency does not need to "'search *every* possible place a record may conceivably be stored . . . only those places where it is *reasonably likely* to be found." *Hood*, 33 Wn. App. 2d at 814 (quoting *Neigh. All.*, 172 Wn.2d at 720).

2.      *The City's Search*

To demonstrate the adequacy of its search, the City relied on declarations[8] from the City's public records officer (PRO)—who was also the city clerk—and the city attorney.

According to the PRO, the City "treated Mr. Hood's [public records request] just as it does every other [request] it receives." CP at 1101. Hood submitted his request while COVID emergency protocols were in effect and city employees were working remotely. City employees continued to work remotely through most of its search for responsive records to Hood's request.

When the PRO received Hood's request, they requested the city attorney's office to conduct a search for responsive records because the subject matter of Hood's request was "a prior lawsuit against the City." CP at 198. Because Hood's request spanned two subject matters different city offices worked with, the lawsuit and the public records requests underlying the lawsuit, the City divided the search for responsive records between the city attorney's office and the city clerk's office, respectively. The exception was that the clerk's office searched city e-mails for responsive records concerning both subject matters because the City centrally archived all e-mails and their attachments.[9]

The city clerk's office was responsible for managing the City's records and responses to public records requests. Accordingly, the city clerk's office both managed and coordinated

---

[8] GR 13(a) allows for the submission of an unsworn declaration in lieu of an affidavit so long as the declaration was signed in accordance with GR 30 and contained the proper recitation that it was made under penalty of perjury. Each of the PRO and city attorney's declarations contained a declaration following a form expressly provided by GR 13(a).

[9] This practice was consistent with the City's public records request process. CP at 209 ("[The PRO] reviews the request and sends it to every department associated with the records being requested. . . . All email searches are done by City Clerk. . . . The departments review their own documents and determine their responsiveness and their redactions/exemptions, if any.").

fulfilling Hood's request as well as searched for responsive records related to the underlying public records requests from Bungert's lawsuit.

In searching for any physical records, the PRO and another city employee searched "all physical files related to the original Bungert [public record request] that was the subject matter of the *Bungert* PRA lawsuit." CP at 199. They additionally searched for records associated with prior public records requests submitted to the City by Bungert, his son, and his wife. The city clerk's office digitized any hard copy records and included them in the records produced to Hood.

The PRO also searched City e-mails and their attachments through an archiver software. The PRO searched for e-mails, included archived and "deleted" e-mails, within a date range between the filing of Bungert's PRA lawsuit and one day after Hood's public records request. CP at 199. The PRO searched e-mails in that range using a combination of terms: "'Bungert'"; "'lawsuit'"; the name of the claims manager for the company who provided insurance defense counsel for the City in the Bungert lawsuit; "'Ted Danek,'" the name of the former City Administrator before and overlapping with Bungert's lawsuit and his underlying public records requests; the name of the defense counsel who represented the City in the lawsuit; and that attorney's e-mail address. CP at 193, 199. As "new information was uncovered," the PRO conducted "multiple email searches." CP at 199.

The clerk's office also searched the City's social media accounts. However, it appears that the search of those accounts was more limited than the e-mail search parameters as the PRO stated, "[They] expected that records regarding the litigation would not be found after the conclusion of the lawsuit in July 2019." CP at 1099.

The clerk's office did not search the e-mails for records produced to Bungert as part of searching for public records requests underlying Bungert's lawsuit. The PRO stated that any e-mails responsive to Bungert's public records requests were not stored in e-mails because those records were maintained with other records related to Bungert's requests.

The PRO stated that, two months prior to Hood's request, the City had received "a similar" public records request. CP at 200. In responding to that request, the city attorney had asked the City's defense counsel from Bungert's lawsuit to "provide to the City any records in [their] possession related to the *Bungert* lawsuit." CP at 194. Counsel provided the PRO with two thumb drives containing digital records and a box of physical paper records. The PRO digitized the physical records and, after reviewing all of the records for attorney-client privilege and other exemptions, the PRO prepared the non-exempt records for production to Hood.

The city attorney stated that they searched both their city computer's hard drive and a citywide shared drive by using the terms "'Bungert,'" the cause number for Bungert's lawsuit, and the last name of counsel who represented Bungert in the lawsuit. The city attorney also searched the digital file for Bungert's PRA lawsuit housed in a digital subfolder for specific city litigation. Moreover, the city attorney searched "all physical paper files in the city attorney's office, my City issued cell phone, my personal cell phone, and my personal email account." CP at 194.

According to the PRO, the City had been working on being "paperless" and so the majority of the City's records were digitized. CP at 1101. The City's search did not include searching the City's website or a file within a filing cabinet in city hall. CP at 400. The file appeared to be a file regarding the resolution that city council adopted for Bungert's settlement agreement.

The City's search of city council records, the group who approved the settlement of Bungert's case, appears to have been limited to the searches described above.[10]  The City provided Hood a link to a recording of the city council meeting when the council approved the settlement; however, the link was provided as a hyperlink within the copy of a comment on a social media platform.  CP at 124, 393.  The PRO stated that the city council meetings were recorded by Pierce County Television, "a separate public agency operated by the Rainier Cable Commission."  CP at 1098.  Neither the city attorney nor the clerk's office searched through video recordings of later city council meetings because they did not believe that the recordings would contain responsive records.

Neither the city attorney nor the clerk's office searched the city council meeting's agendas or minutes.  The city attorney explained the limited search by stating:

> In virtually all cases, the City's records regarding litigation are not found among the records of City Council meetings. That is because communications with the City Council regarding litigation occur in Executive Session with me where no minutes are kept to preserve the confidentiality of the process as allowed by law.

CP at 1095.  Both the city attorney and the PRO stated that Bungert's lawsuit "was completely out of the ordinary for the City because it resulted in a settlement approved by the City Council."  CP at 1095.  Prior to the settlement of Bungert's lawsuit, the City had not settled any recent lawsuit and, since at least 2016, there had been no council-approved settlement.

---

[10] The PRO stated in their declaration that the City provided Hood with links to videos recordings of city council meetings, including links to recordings of three city council meetings up to four months after the City settled Bungert's lawsuit.  However, this appears to have occurred through discovery, not in fulfilling Hood's public records request.  *See* CP at 395 ("The City provided Mr. Hood in discovery the links to the videos of the August, September, and December 2019 City Council meetings.").

3.      *Considering the City's Search as a Whole, the City's Search for Responsive Records Was Reasonable*

Preliminarily, Hood claims that the City's search was inadequate because the City did not provide evidence that it followed a general process for responding to Hood's public records request. The record says otherwise. The PRO stated that the City "treated Mr. Hood's [public records request] just as it does every other [request] it received." CP at 1101. They attached to their first declaration a copy of the City's public records request procedure, outlining details including how the City responds to requests, how it searches for records, how it reviews potentially responsive records, and various other process details. In another declaration, the PRO stated that "[t]he public records response process . . . has long been used by the City, *including* in response to the Hood [public records request]." CP at 1231. Accordingly, Hood's argument is unsupported by this record.

We turn to whether the City's search, as a whole, was reasonably calculated to locate the City's responsive records.

Hood raises a series of arguments for why the City's search was inadequate.[11] Through these arguments, Hood effectively asserts that that City's search should have included the following: searching for records related to other public records requests, including requests made in 2019 by Bungert, his wife, and the attorney who represented Bungert in his PRA lawsuit; an earlier date range for the City's e-mail search; searching the physical and non-e-mail records of

---

[11] Hood additionally argues that the City "shirk[ed]" a burden to prove adequacy of its search "'beyond a material doubt'" because the City brought—and the trial court ultimately dismissed the case based on—an "overlength" and "not [] legitimate" motion for judicial review. Br. of Appellant at 64 (quoting *Neigh. All.*, 172 Wn.2d at 720). However, Hood does not explain how either the fact that the City also moved for relief below or the length of the City's motion affected the City's burden below.

former and other current city employees, with only one employee who was employed with the City at the time of Hood's request and whose physical and non-e-mail records the City did not search; using different but unspecified terms in the City's digital files searches; an unspecified date-specific search through the city attorney and the City's former counsel's records; searching a physical cabinet in city hall that was later discovered to contain 12 city council records having a connection to the Bungert lawsuit; in addition or instead of just providing Hood with the records the City provided to Bungert in response to Bungert's September 2016 and October 2017 public records requests, re-searching the City's records for responsive records to those requests; and searching Pierce County and SS911 for responsive records.

As discussed above, the plain language of Hood's request included records related to Burgert's PRA litigation and the lawsuit's underlying public records requests, which were from 2016 and 2017—not earlier public record requests or requests from 2019. *See supra* I.B.  The City did not "'limit its search to only one record system.'" *Neigh. All.*, 172 Wn.2d at 720 (quoting *Oglesby,* 126, 920 F.2d at 68).  Instead, from the declarations of the city attorney and the PRO, the City conducted quite an extensive search.  Among other recording systems or locations, the City searched the City's e-mails—including archived and deleted e-mails—and their attachments, the city clerk's office's and the city attorney's physical records, a citywide shared drive, the City's digital file for Bungert's PRA lawsuit, records provided to the City by the City's defense counsel in Bungert's PRA lawsuit, and the city attorney's work computer's hard drive, work cell phone, personal cell phone, and personal e-mail account.

The fact that an agency failed to locate and disclose a record eventually found does not amount to a per se violation of the PRA.  *Hood*, 33 Wn. App. 2d at 814.  Instead, we focus on the adequacy of the agency's entire search.  *Id.* at 814-15.

To be sure, the City's search was not perfect. But perfection is not the standard; "adequacy," as evaluated through the lens of reasonableness, is. *Neigh. All.*, 172 Wn.2d at 720. An agency only has to search places where it is "reasonably likely" a responsive record would be found. *Id.* Given the subject of Hood's public records request, the City searched those places reasonably likely to contain the two types of records Hood requested: litigation records and public records request records. Considering the City's search as a whole and as supported by reasonably detailed and nonconclusory declarations presumed to have been made in good faith,[12] we hold that the City adequately searched for records responsive to Hood's request.

E.      *Hood's Arguments That the City Failed To "Fully Assist" Him and Did Not Provide Access To Responsive Records Fails*

Hood argues that the City failed to "fully assist Hood" because the City did not confirm the total number of records it produced and because the portal link providing Hood access to the responsive documents was "defective." Br. of Appellant at 73.-74. Hood claims that these alleged facts created a violation of the PRA. We disagree.

First, to support Hood's argument that the City was required to "fully assist Hood" under the PRA, Hood relies only on RCW 42.56.100. Br. of Appellant at 73. But Hood misconstrues the statute. RCW 42.56.100 provides, in relevant part, that:

> Agencies shall adopt and enforce reasonable rules and regulations . . . consonant with the intent of this chapter to provide full public access to public records, to protect public records from damage or disorganization, and to prevent excessive interference with other essential functions of the agency. . . . *Such rules and*

---

[12] Although Hood argues that the attorney representing the City below acted in "bad faith," Hood makes no argument that city employees who submitted declarations describing their search acted in bad faith in submitting their declarations. *See* Br. of Appellant at 79 (arguing that the City's counsel below acted in bad faith by allegedly "delaying disclosure of requested records and increasing City's liability."). And, in PRA cases, we presume agency affidavits are submitted in good faith. *Hood*, 33 Wn. App. 2d at 815.

>*regulations* shall provide for the fullest assistance to inquirers and the most timely possible action on requests for information.

(Emphasis added.)  Hood does not challenge any City rule or regulation.  Additionally, Hood does not provide any other authority indicating that the City was required under the PRA to "fully assist" Hood outside of adopting and enforcing reasonable rules and regulations providing so.  Nor does Hood point to any other authority requiring the City to confirm the number of responsive records with the requestor.[13]  *See DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none."); *see also* RAP 10.3(a)(6).

Additionally, Hood's claim that the City did not provide Hood access to the responsive documents is unsupported by the undisputed facts below.  Per one of Hood's own declarations, Hood admitted "[t]he City provided installments of records to Hood on various dates in 2020, 2021 and 2022."  CP at 79.  Hood additionally admitted that, after the City's June 15, 2022, e-mail and letter fulfilling Hood's request in full, Hood asked the City to confirm the number of provided items because Hood had "received multiple records of various types on multiple dates, with some records embedded within others."  CP at 80.  Hood filed the City's June 15, 2022, e-mail and letter through his declaration, which Hood declared were true and correct copies.  The e-mail from the City clearly included a portal link which the City stated provided access to all responsive records.  Hood responded to the e-mail with the portal link acknowledging that he received the records: "I received a total of 380 separate documents."  CP at 89.

---

[13] Instead, the City's PRO stated that, per a general policy, the City did not respond to further requests about a public records request once that request was closed unless the requester was seeking to make a new public records request.

In summary, we conclude that the City did not impermissibly narrow the scope of Hood's public records request, the City's request for clarification was timely, the City's search for responsive records was reasonably calculated to discover responsive records and was therefore adequate, and Hood's arguments that the City failed to "fully assist" him in fulfilling his request and that the City did not provide access to responsive documents fails. Accordingly, we hold that the trial court did not err in granting the City's motion and dismissing Hood's lawsuit.

## II. MOTIONS FOR RELIEF FROM JUDGMENT

Hood claims that the trial court erred in denying both of his CR 60(b) motions.

CR 60(b) permits a trial court to relieve a party from a final judgment for specifically enumerated reasons. "The party seeking relief under CR 60(b) bears the burden of showing relief is warranted." *Gates v. Homesite Ins. Co.*, 28 Wn. App. 2d 271, 278, 537 P.3d 1081 (2023). Relief under CR 60(b) is an "[e]xtraordinary remedy." *Dalton v. State*, 130 Wn. App. 653, 665, 124 P.3d 305 (2005). The limited circumstances in which CR 60(b) allows relief from a final judgment provide "a balance between finality and fairness." *Shandola v. Henry*, 198 Wn. App. 889, 895, 396 P.3d 395 (2017). For "[f]inality of judgments is a central value in the legal system, but circumstances can arise where finality must give way to the greater value" of justice. *Id*.

"'A trial court's denial of a motion to vacate under CR 60(b) will not be overturned on appeal unless the court manifestly abused its discretion.'" *Coogan v. Borg-Warner Morse Tec Inc.*, 197 Wn.2d 790, 820, 490 P.3d 200 (2021) (quoting *Haley v. Highland*, 142 Wn.2d 135, 156, 12 P.3d 119 (2000)). The trial court abuses its discretion if it clearly exercised discretion that was manifestly unreasonable, based its decision on untenable grounds, or based it on untenable reasons. *Mitchell v. Wash. State Inst. of Pub. Pol'y*, 153 Wn. App. 803, 821, 225 P.3d

280 (2009). If the trial court rests its decision on facts unsupported in the record or reaches its decision by applying the wrong legal standard, the trial court's decision was based on "untenable grounds" or was made for "untenable reasons." *Id*. at 821-22. The trial court's decision was "manifestly unreasonable" if the trial court adopted a view no reasonable person would take or arrived at a decision "'outside the range of acceptable choices.'" *Id.* at 822 (quoting *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003).

Moreover, in reviewing a trial court's CR 60(b) decision, "'we may affirm the trial court on any basis that the record supports.'" *Coogan*, 197 Wn.2d at 820 (quoting *State v. Arndt*, 194 Wn.2d 784, 799, 453 P.3d 696 (2019)).

Hood brought two motions under CR 60(b) below, each raising a reason for relief from judgment under CR 60(b)(3) and (4). The two reasons asserted below and argued here are (1) for "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial" and (2) fraud, misrepresentation, or other misconduct of an adverse party. CR 60(b)(3), (4).

Relief under CR 60(b)(3) is appropriate when "newly discovered evidence '(1) would probably change the result if a new trial were granted, (2) was discovered since trial, (3) could not have been discovered before the trial by the exercise of due diligence, (4) is material, and (5) is not merely cumulative or impeaching.'" *Coogan*, 197 Wn.2d at 821 (quoting *Jones v. City of Seattle*, 179 Wn.2d 322, 360, 314 P.3d 380 (2013)).

Hood argued that relief was warranted under CR 60(b)(3) based on "newly discovered evidence" that the City had kept and not produced responsive records at the County and at SS911. CP at 1345. But Hood had already raised this argument, without the new evidence Hood relied on for his CR 60(b) motions, in response to the City's motion for judicial review and

dismissal. The trial court rejected Hood's argument by granting the City's motion, dismissing Hood's case, and finding that the City adequately searched for responsive records.

In ruling on Hood's CR 60(b) motions, among other findings, the trial court found that Hood failed to meet his burden to show that relief under CR 60(b)(3) was warranted because he did not establish any new evidence that would change the result if the case were reopened. Because we can affirm on any grounds supported by the record, this finding alone supported the trial court's decision to deny Hood's motion. *See Jones*, 179 Wn.2d at 360 (the requirements to justify relief under CR(b)(3) are elements a movant "must establish."). Even assuming without deciding that the City had the authority to search another agency's records, the City's entire search was not inadequate because the City did not search the County or SS911 for potentially responsive City records considering the plain language of Hood's request. *See supra* I.D.3. The trial court's denial of Hood's request for relief under CR 60(b) was neither manifestly unreasonable nor untenable.

Relief under CR 60(b)(4) is appropriate "when the party challenging the judgment 'establish[es] . . . by clear and convincing evidence' that it 'was prevented from fully and fairly presenting its case or defense' due to 'fraud, misrepresentation, or other misconduct of an adverse party.'" *Coogan*, 197 Wn.2d at 821 (quoting *Lindgren v. Lindgren*, 58 Wn. App. 588, 596, 794 P.2d 526 (1990)).

Hood argues that relief was warranted under CR 60(b)(4) because he contended the City failed to identify the County as a location where it kept responsive records and "concealed from Hood and [the] Court that it kept responsive records at [SS911] and falsely claimed that it had no duty to search there." CP at 1434. In considering Hood's motions, the trial court found that Hood did not establish by clear and convincing evidence that the City engaged in any fraud,

misrepresentation, or misconduct. The City never contended that it had searched the County or SS911's records pursuant to Hood's public records request. Based on this alone, the trial court did not abuse its discretion in finding that Hood did not establish that any fraud, misrepresentation, or misconduct on the City's part had occurred.

We hold that the trial court did not manifestly abuse its discretion in denying Hood's CR 60(b) motions.

## CONCLUSION

We hold that Hood fails to show that the trial court erred in finding that the City adequately searched for responsive records related to Hood's specific request. Additionally, we hold that Hood fails to establish that the trial court abused its discretion in denying Hood's motions for relief from judgment. Moreover, due to insufficient briefing, we decline to consider any argument Hood may have related to the trial court's denial of his motion for summary judgment or motion for reconsideration. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Glasgow, J.

Veljacic, C.J.

27